UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x     No.: 17-cv-3584
ERICA O'DONNELL, and DONNA ORELLANA,

                              Plaintiffs,

        -against-                                **COMPLAINT**

STARDUST DINERS, INC. d/b/a Colony Diner,        ***Jury Demanded***
and GEORGE STRIFAS,

                              Defendants.
----------------------------------------------------------------x

        Plaintiffs allege, upon knowledge as to themselves and their own actions, and upon

information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1. This is an action seeking to recover unpaid wages, liquidated damages, pre- and

   post-judgment interest, and reasonable attorneys' fees and costs relating to Defendants'

   willful violations of the Fair Labor Standards Act of 1938 (FLSA) and the New York

   State Labor Law (NYLL), as well as to recover back pay and compensatory damages as a

   result of Defendants' creation of a hostile working environment based upon age and

   gender.

2. Specifically, Defendants were, at all relevant times, in the business of operating a

   restaurant known as Colony Diner located in East Meadow, New York, which employed

   Plaintiffs as servers without properly compensating them by paying the minimum wage

   and required overtime rate as required by the FLSA and NYLL, and spread of hours pay

   as required by the NYLL. Defendants also illegally retained a portion of the gratuities

   Plaintiffs should have received, illegally made deductions from Plaintiffs' pay for meals

which they did not take, and wholly failed to comply with the requirements to provide an annual pay notice and compliant weekly wage statement under the New York Wage Theft Prevention Act.

3. In addition, Plaintiffs were subjected to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964 (Title VII), the Age Discrimination in Employment Act of 1967 (ADEA), and the New York State Human Rights Law (NYSHRL).

4. Further, Defendants unlawfully terminated Plaintiff O'Donnell as a result of her filing of a Charge of Discrimination with the United States Equal Employment Opportunity Commission and falsely claimed to the police that Plaintiff had committed the crime of computer trespass, which resulted in Plaintiff O'Donnell's arrest and her having to expend substantial monies to retain an attorney and defend herself against such baseless charges.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs brings their claims under the FLSA, Title VII, and the ADEA, each a federal statute.

6. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because the state claims are so related to the federal claims that they form a part of the same case or controversy between Plaintiffs and Defendants.

7. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims took place within this judicial district.

**PREREQUISITES TO SUIT**

8. Plaintiffs have complied with all prerequisites to suit with respect to their claims under Title VII and the ADEA. Plaintiffs filed timely Charges of Discrimination with the United States Equal Employment Opportunity Commission on March 7, 2016, and requested and received a Dismissal and Notice of Rights on March 18, 2017.

9. This action is being filed within 90 days of Plaintiffs' receipt of their Dismissal and Notice of Rights.

**PARTIES**

10. Plaintiff ERICA O'DONNELL, at all relevant times, was an adult individual residing in the County of Nassau and State of New York.

11. Plaintiff DONNA ORELLANA, at all relevant times, was an adult individual residing in the County of Nassau and State of New York.

12. Defendant STARDUST DINERS, INC. d/b/a Colony Diner (Colony Diner), at all relevant times, was a for-profit corporation organized and existing under the laws of the State of New York, with its principal place of business located at 2019 Hempstead Turnpike, East Meadow, New York 11576.

13. At all relevant times, Colony Diner was in the business of operating a restaurant. Its business was, and is, engaged in interstate commerce within the meaning of the FLSA and has, upon information and belief, annual gross sales of at least $500,000.

14. At all relevant times, Colony Diner was a restaurant subject to the Minimum Wage Order for the Hospitality Industry promulgated by the New York State Department of Labor, 12 N.Y. C.R.R. Part 146.

3

15. At all relevant times, Colony Diner employed more than 15 persons such that it is an employer within the meaning of Title VII, the ADEA, and the NYSHRL.

16. Defendant GEORGE STRIFAS, at all relevant times, was an adult individual residing in the County of Nassau and State of New York. George Strifas was a corporate officer, director, manager, and one of the ten largest shareholders of Colony Diner. George Strifas was also one of Plaintiffs' direct supervisors, and regularly exercised day-to-day operational control of Colony Diner as the manager of the restaurant, in that George Strifas assigned work to Plaintiffs, scheduled Plaintiffs' hours, hired and fired Colony Diner employees, and set the rate and method of payment to Plaintiffs and Colony Diner employees.

17. Defendants directly employed Plaintiffs, individually and as joint employers, within the meaning of the FLSA, NYLL, and the NYSHRL in that they controlled the means and manner of production of Plaintiffs' work.

18. Defendant Strifas, as an officer, director, shareholder, manager, or agent of Colony Diner, had control over the day-to-day employment practices of Colony Diner and was responsible for the wage and hour and discriminatory practices complained of herein; therefore, he is an "employer" within the meaning of the FLSA, the NYLL, and the NYSHRL.

19. Plaintiffs' primary duties were to serve food and drink to Colony Diner patrons and perform any other tasks asked of them by Defendants' managers. These activities were conducted at Colony Diner's place of business. Plaintiffs also regularly conducted preliminary and postliminary activities related to their duties, such as attending meetings

and cleaning the restaurant.

## ALLEGATIONS COMMON TO ALL CLAIMS

20. Defendants employed O'Donnell as a server from approximately August 2011 through on or about October 31, 2016. Her work was performed in the normal course of Colony Diner's business and was integrated into the business of Colony Diner.

21. Defendants employed Orellana as a server from approximately January 2000 to in or about March 2016; however, Orellana was not employed by Defendants for a period of time between 2007 and 2008. Her work was performed in the normal course of Colony Diner's business and was integrated into the business of Colony Diner.

22. O'Donnell is a female who, at the time of her separation from employment with Colony Diner, was 25 years old. During the incidents alleged herein, O'Donnell was between the ages of 19 and 25 years old.

23. Orellana is a female who, at the time of her separation from employment with Colony Diner, was 44 years old. During the incidents alleged herein, Orellana was between the ages of 40 and 44 years old.

24. Defendant Strifas is approximately 50 years old.

## AS AND FOR A FIRST CAUSE OF ACTION

### Title VII - Hostile Work Environment Based on Gender - Plaintiff O'Donnell

25. Defendant Strifas has made numerous comments to Plaintiff O'Donnell or in her presence, during nearly every shift that she worked, that are degrading to women and have caused her to suffer an extremely hostile working environment based upon her gender that affected her emotionally and psychologically.

26. In general, Defendant Strifas enjoys discussing the bodies of female employees and those of the female patrons of the diner, bragging about his past sexual encounters, and retaliating against those employees who choose to not engage in such discussions with him by giving them the least profitable sections of the diner to serve or by flat-out sending them home to not work.

27. Mr. Strifas has made extremely sexual and inappropriate comments directly to O'Donnell and about O'Donnell, as set forth below:

   a. On several occasions (over at least five times), as recently as early 2015, Mr. Strifas told O'Donnell that she has "the ass of a 12-year old boy";

   b. In September 2015, Mr. Strifas asked O'Donnell: "Does your boyfriend [f--k] you too hard sometimes?";

   c. In April 2015, Mr. Strifas asked O'Donnell if she wanted a "sugar daddy," apparently referring to himself as an individual who would give O'Donnell financial support if she engaged in sexual activity with him;

   d. In April 2015, while discussing another server named Jon, Mr. Strifas asked O'Donnell if she was "[f--king] Jon";

   e. In March 2015, Mr. Strifas asked O'Donnell if her acne cleared up because her boyfriend ejaculated on her face;

   f. In a similar light, Mr. Strifas told O'Donnell several times (about three times) that her acne would clear up if she let her boyfriend ejaculate on her face;

   g. In January 2012, Mr. Strifas told O'Donnell that her pants and shirt were too loose-fitting and that she should wear tighter clothes, and in so doing pointed at

other servers to discuss how their bodies looked in their clothing as a comparison to O'Donnell's;

h. Throughout the year 2013, when O'Donnell had a short hairdo, Mr. Strifas frequently told her that if she let her hair grow longer then she "would look less like a dyke and more people would want to [f--k] [her]", and several variations of this sentiment;

i. When O'Donnell first started working at the diner, Mr. Strifas said to her "I bet you're a prude," "I bet you're a virgin," and "I wonder what it takes to get in your pants";

j. In January 2012, Mr. Strifas said to O'Donnell "you probably don't let guys touch you";

k. In April 2015, Mr. Strifas said to O'Donnell "we should hang out and get [f--ked] up together";

l. In February 2015, Mr. Strifas said to O'Donnell "you should gain 10 pounds and maybe it will go to your tits and ass";

m. On March 6, 2015, Mr. Strifas said to O'Donnell "what, did Matt [her boyfriend] [f--k] you too hard last night?";

n. On March 6, 2015, Mr. Strifas said to O'Donnell "how many times did he make you [orgasm]?";

o. On March 6, 2015, Mr. Strifas said to O'Donnell "your back probably hurts from getting rammed";

p. In March 2015, Mr. Strifas said, in O'Donnell's presence, about her, to the air

7

conditioning repairman, "that blonde hair looks like a porn star's, right?";

q. Mr. Strifas once said to O'Donnell, while pulling her hair, "I bet you like when a guy pulls your hair," referring to during sexual intercourse;

r. Mr. Strifas once said to O'Donnell "a big guy would probably break you in half," again referring to sexual intercourse;

s. On many occasions throughout O'Donnell's employment, and as recently as February 2016, whenever O'Donnell arrived to work happy or cheerful, Mr. Strifas would ask: "Did you get laid last night?";

t. Mr. Strifas once commented that O'Donnell was "short enough so you don't even need to get on your knees," referring to oral sex;

u. Mr.bStrifas once asked if O'Donnell liked when "guys" "throw you around" because she is "so tiny," again referring to during sexual intercourse;

v. In the summer of 2014, Mr. Strifas said that O'Donnell should wear shorter shorts and "show a little more ass";

w. In August, 2015, after an employee meeting, in front of another manager and employee, Mr. Strifas said to O'Donnell that "maybe with some five-inch heels, you would look hot";

x. In the summer of 2015, Mr. Strifas asked if O'Donnell had any naked pictures of herself to show him;

y. In the summer of 2015, Mr. Strifas told O'Donnell that if she showed him a naked picture of herself, then he would give her a lot of tables during her shift;

z. In April 2015, Mr. Strifas asked if O'Donnell "let [her] boyfriend [ejaculate]

inside [her]";

aa. In April 2015, Mr. Strifas asked O'Donnell how sexual intercourse "was" with her boyfriend, apparently referring to whether it was pleasurable or not;

bb. Mr. Strifas once asked O'Donnell if she has "ever been [c--k] slapped";

cc. Mr. Strifas once said to O'Donnell: "your ass got bigger";

dd. In October 2015, Mr. Strifas said to O'Donnell: "you've filled out since you started working here," referring to either her breasts or her backside;

ee. In April 2015, Mr. Strifas asked O'Donnell whether she has cheated on her boyfriend, which O'Donnell took to mean as an inquiry into whether she would cheat on her boyfriend with Mr. Strifas;

ff. In April 2015, during the same conversation, Mr. Strifas said: "you need an older man to [f--k] with no strings attached";

gg. In April 2015, during the same conversation, Mr. Strifas said: "you're probably better off with an open relationship so you can [f--k] anyone you want";

hh. In April 2015, during the same conversation, Mr. Strifas asked O'Donnell: "what's the oldest guy you've ever been with," referring to sexual intercourse;

ii. Mr. Strifas once grabbed O'Donnell's arm and told her that she has soft skin;

jj. In October 2015, Mr. Strifas pretended to burn O'Donnell with his cigar and then said "you probably like [sh-t] like that";

kk. Mr. Strifas has also pulled O'Donnell's hair numerous times, even after she told him not to touch her, and said, again, "you probably like [sh-t] like that," or some variation of that remark;

ll.  On February 14, 2016, Mr. Strifas said to O'Donnell, referring to her appearance: "Everything looks good on you lately, except you should consider getting your lips done; you know, like Kardashian lips."

28.  Mr. Strifas does not only harass O'Donnell, but has also made such degrading comments to or in front of other female servers such that they resigned from employment as a result of it, including Judith, Erica, Catalina, Abbey, and Stephanie.

29.  Aside from the comments made directly to O'Donnell, Mr. Strifas engages in general conversation among groups of servers and other managers that are also of a sexual nature and degrading to women, which affect O'Donnell personally as a woman. Such circumstances include the following:

a.  During the holiday season of 2014, Mr. Strifas showed a naked picture of himself that was on his cell phone of him laying across a fireplace, and joked that it was holiday card;

b.  Mr. Strifas, at least once per month, as recently as September of 2015, has shown naked or semi-nude or clothed pictures of women that he supposedly met at nightclubs whom he claimed he was having sexual relations with or dating;

c.  Mr. Strifas talks about these women that he is supposedly having sexual relations with, while showing their pictures, and asking, for example, "how do you like these tits? Yeah, I got that last night";

d.  On numerous occasions, as recently as February 2016, O'Donnell overheard Mr. Strifas telling other female servers how they should dress in order to be considered (in his eyes) more attractive;

e.  On a near-daily basis, as recently as March 1, 2016, O'Donnell overheard Mr. Strifas commenting on the appearances, clothing, body type, and intimate body parts of female customers in the context of asking other servers and cooks about their opinions of the women, and he goes around the diner and pulls male waiters and servers aside to go have a look at the particular woman in question to comment on her. For example, on March 1, 2016, Mr. Strifas commented about a customer that: "she has a pretty face and a nice ass";

f.  In the summer of 2015, Mr. Strifas showed O'Donnell a picture of himself wearing a Speedo bathing suit while at the beach and asked O'Donnell "isn't that great for a guy my age?";

g.  On several occasions in or around winter 2014, Mr. Strifas has bragged that he was purportedly having sexual intercourse with one of the cashiers at the diner in a motel and in his downstairs office, and that his wife walked in on him engaging in such behavior. Mr. Strifas often discusses his divorce from his wife and talks about how he has been caught cheating on her with other women;

h.  On many occasions, as recently as January 2016, O'Donnell witnessed Mr. Strifas touching or grabbing the backside and hips of female waitresses;

i.  In November 2015, Mr. Strifas discussed that he was buying a new town home in the wake of his divorce and that it was "great, because it can be like Grand Central Station" because he can "have a different woman every night";

j.  On numerous occasions, as recently as January 2015, O'Donnell overheard Mr. Strifas telling other female servers how they should dress in order to be

11

considered (in his eyes) more attractive. Specifically, in the January 2015 incident, Mr. Strifas commented to a hostess, Danielle, that her sweater was too big, referring to the fact that it did not reveal her body as much as he apparently likes, and also said to her that she has (in his eyes) "gotten fatter" since she went away to college, which made Danielle immediately cry and leave to go to the bathroom to be alone;

k.   Mr. Strifas has commented several times that he needs to hire "young hot waitresses, because that's what make the people come back, like a Hooter's style," apparently referring to the Hooter's restaurant chain, also said similar comments to customers, and told males customers when seating them: "Come this way. I'll give you a hot waitress."

30.   The harassment became so bad that O'Donnell began to cry in front of the customers she was serving and had to have discussions with other servers such as Donna Orellana, Amanda Orbe, and Judith Solorzano about it. O'Donnell would also go home from work and cry about what occurred during her shifts, such that she needed to tell her boyfriend and family about what was going on at work.

31.   All of the above harassment, including Mr. Strifas touching O'Donnell on numerous occasions, the comments made about other women that made her feel like just another piece of meat, the vulgar comments directed at her and about her appearance which affected her self-confidence, the disgusting sexual comments made about her and her boyfriend which made her feel less than human, and being required to view naked pictures of her boss, have made her extremely uncomfortable at work to the point where

she feared she had to make a choice between being unemployed or else enduring the intolerable atmosphere at the diner. O'Donnell is psychologically and emotionally harmed, as she has either cried at work on many occasions or has gone home to sob as a result of Mr. Strifas's behavior. This atmosphere has not only affected O'Donnell, but has also put a significant strain on her relationship with her boyfriend, loved ones, and men in general.

32. The foregoing conduct constitutes a hostile work environment based upon gender in violation of 42 U.S.C. § 2000e-2(a), making Defendant Stardust Diners, Inc. liable to Plaintiff O'Donnell for compensatory damages, attorneys' fees, and the costs and disbursements of this action.

**AS AND FOR A SECOND CAUSE OF ACTION**

**NYSHRL - Hostile Work Environment Based on Gender - Plaintiff O'Donnell**

33. The conduct set forth in the First Cause of Action also constitutes a hostile work environment based upon gender in violation of NY Executive Law § 296(1)(a), making Defendants liable to Plaintiff O'Donnell for compensatory damages, attorneys' fees, and the costs and disbursements of this action.

**AS AND FOR A THIRD CAUSE OF ACTION**

**Title VII - Retaliation - Plaintiff O'Donnell**

34. Defendants submitted a response to O'Donnell's Charge of Discrimination on or about August 29, 2016; thus, Defendants were aware of O'Donnell's complaint regarding practices which would be discriminatory under Title VII and NYSHRL.

35. Defendant Strifas then began surreptitiously monitoring O'Donnell in an attempt to find a

reason to terminate her employment that would not look like retaliation.

36. On or about October 31, 2016, Defendant Strifas contacted the Nassau County Police Department and falsely claimed that O'Donnell had accessed the Diner's computer system without permission on several occasions by using a manager's keycard.

37. O'Donnell was arrested by the police and charged with the crime of computer trespass.

38. Simultaneously, Defendants terminated O'Donnell's employment.

39. In doing so, Defendants were motivated solely by retaliatory motives, and O'Donnell's filing of a Charge of Discrimination with the United States Equal Employment Opportunity Commission was the cause in fact of her termination from employment.

40. Defendants would not have engaged in the foregoing conduct had O'Donnell not filed a Charge of Discrimination.

41. The foregoing conduct would dissuade a reasonable worker from making a good faith opposition to discriminatory practices or filing a charge, testifying or assisting in the preparation of a charge of discrimination.

42. As a result of the foregoing, O'Donnell had to retain an attorney, at her own expense, to defend her against these baseless criminal charges.

43. As a result of the foregoing, O'Donnell has lost her wages and her tips that she would have received had she continued working for the Defendants.

44. As a result of the foregoing, O'Donnell has experienced extreme anxiety and stress as a result of being a criminal defendant and having lost her income.

45. The foregoing conduct constitutes discrimination based upon O'Donnell's good faith opposition to discriminatory practices in violation of 42 U.S.C. § 2000e-3(a), making

Defendant Stardust Diners, Inc. liable to Plaintiff O'Donnell for compensatory damages, attorneys' fees, and the costs and disbursements of this action.

## AS AND FOR A FOURTH CAUSE OF ACTION

### NYSHRL - Retaliation - Plaintiff O'Donnell

46. The conduct set forth in the Third Cause of Action also constitutes discrimination based upon O'Donnell's good faith opposition to discriminatory practices in violation of NY Executive Law § 296(7), making Defendants liable to Plaintiff O'Donnell for compensatory damages, attorneys' fees, and the costs and disbursements of this action.

## AS AND FOR A FIFTH CAUSE OF ACTION

### ADEA and Title VII- Hostile Work Environment
### Based on Age and Gender - Plaintiff Orellana

47. Mr. Strifas has made numerous comments to Orellana or in her presence, during nearly every shift that she worked, that are degrading to women and to her, personally, as an individual over 40 years old, which have caused her to suffer an extremely hostile working environment based upon her age and gender that has affected her emotionally and psychologically.

48. Below are some of the comments that Mr. Strifas has made to Orellana referring to her age:

   a. On several occasions, as recently as December 2015, Mr. Strifas told Orellana that "it's time to put you out to pasture," referring to her age and potential for retirement;

   b. On at least five occasions, as recently as in the beginning of 2016, Mr. Strifas told Orellana that he needed to hire "young hot waitresses, because that's what make

the people come back, like a Hooter's style," apparently referring to the Hooter's restaurant chain;

c. On three occasions, as recently as December 2015, Mr. Strifas has asked Orellana: "how much longer do you think you'll be able to do this job," referring to her age and potential for retirement;

d. On January 6, 2016, when four New York State Troopers came to eat at the diner, he pulled them away from being seated in Orellana's section of the diner and told them he was going to "give [them] instead to the best looking server here," referring to a 22-year-old female waitress;

e. During general conversation among other servers, and as recently as January 2016, Mr. Strifas would often make comments about how Orellana is "the oldest one here," referring to her age in front of other employees;

f. Orellana has witnessed Mr. Strifas instructing female servers to dress in (what he apparently considers) a sexy manner, and some of the girls actually do so. Orellanas often asked them why they would do so, and if Mr. Strifas overhears her, he says to her: "Don't worry about it Donna." Orellana often commented that she would not let my daughter leave the house looking like that, and in response Mr. Strifas typically tells Orellana: "well, that's 'cause you're old."

49. Aside from the above, Mr. Strifas enjoys discussing the bodies of employees and those of the female patrons of the diner, bragging about his past purported sexual encounters, and retaliating against those employees who choose to not engage in such discussions with him by giving them the least profitable sections of the diner to serve or by flat-out

16

sending them home to not work. Mr. Strifas has engaged in vulgar behavior and has made extremely sexual and inappropriate comments about female employees and patrons, as set forth below. Mr. Strifas engages in general conversation among groups of servers and other managers that are also of a sexual nature and degrading to women, which affect Orellana personally as a woman. Orellana has also witnessed Mr. Strifas inappropriately touching female employees in a sexual manner and engaging in sexual conduct with female employees at the workplace, which make her uncomfortable, to say the least. Such circumstances include the following:

a. During the holiday season of 2014, Mr. Strifas showed a naked picture of himself that was on his cell phone of him laying across a fireplace to other employees in a group discussion, and joked that it was holiday card, and said that he could not show it to Orellana because he did not want her to "get excited";

b. Mr. Strifas, at least once per month, as recently as November of 2015, has shown naked or semi-nude or clothed pictures of women that he supposedly met at nightclubs whom he claimed he was having sexual relations with or dating;

c. Mr. Strifas talks about women that he is supposedly having sexual relations with to male employees, showing their pictures, and asking, them questions about what these male employees think of the women in terms of appearance and body type;

d. On numerous occasions, as recently as December 2015, Mr. Strifas told a story about how when he was in college he spent time in a hot tub jacuzzi with four women in Colorado, and then stated that he "could get with any of them," referring to sexual intercourse;

17

e.  On several occasions, as recently as summer 2015, Mr. Strifas has bragged that he was purportedly having sexual intercourse with one of the cashiers at the diner in a motel and in his downstairs office, and that his wife walked in on him engaging in such behavior. Mr. Strifas often discusses his divorce from his wife and talks about how that is the fourth time his wife has caught him cheating on her with another woman;

f.  In approximately September 2015, Orellana witnessed Mr. Strifas fondling a cashier named Sandra behind the counter in a sexual manner and she recognized that customers could see as well and were looking at them. Orellana told Mr. Strifas: "you know customers can see you." Mr. Strifas did not stop and simply responded: "Don't worry about it, Donna";

g.  On many other occasions, as recently as last February 2016, Orellana has witnessed Mr. Strifas touching or grabbing the hair and backsides of female waitresses in the kitchen of the diner. In such circumstances, Orellana is essentially a captive audience member because she cannot do her job if she does not attend to the customer's food in the kitchen in a timely manner. It had gotten to the point where Orellana had taken it upon herself to make a lot of noise when entering the kitchen so that Mr. Strifas stopped this behavior prior to her entry;

h.  In November 2015, Mr. Strifas discussed that he is buying a new town home in the wake of his divorce and that that is "great, because it can be like Grand Central Station" because he can "have a different woman every night";

i.  On numerous occasions, as recently as January 2015, Orellana overheard Mr.

Strifas telling other female servers how they should dress in order to be considered (in his eyes) more attractive. Specifically, in the January 2015 incident, Mr. Strifas commented to a hostess, Danielle, that her sweater was too big, referring to the fact that it did not reveal her body as much as he apparently likes, and also said to her that she has (in his eyes) "gotten fatter" since she went away to college, which made Danielle immediately cry and leave to go to the bathroom to be alone;

j.  On numerous occasions, Orellana overheard Mr. Strifas commenting on the appearances, clothing, body type, and intimate body parts of female customers in the context of asking other servers and cooks about their opinions of the women, and he goes around the diner and pulls male waiters and servers aside to go have a look at the particular woman in question to comment on her. For example, Orellana heard Mr. Strifas negatively say: "what is she thinking wearing that? Look at her legs. Imagine what the rest of her looks like";

k.  On one occasion in approximately July 2015, it was hot and Orellana commented as much, and Mr. Strifas said to her that she "should lose some weight and [she] would stop sweating";

l.  In 2012, Orellana walked in on Mr. Strifas and a female server, Lydia, kissing in the bathroom with his hands inside the woman's blouse. When Mr. Strifas saw Orellana, he threatened that she should not say anything and that it "should stay between us";

m.  In 2013, Mr. Strifas called Orellana and Lydia "stupid [f--king] [c--ts,]" in the

19

middle of the dining room such that customers and other employees could hear him. Lydia began to cry. Orellana threatened to quit. Another manager, Tommy Strifas, spoke to Orellana later on the telephone along with Orellana's husband who was present with her. Tommy told Orellana that George Strifas would be apologizing to her, which he later did, and Orellana returned to work;

n.  On at least five occasions, as recently as the beginning of 2016, Mr. Strifas has told Orellana that he needs to hire "young hot waitresses, because that's what makes the people come back, like a Hooter's style," apparently referring to the Hooter's restaurant chain;

o.  Orellana witnessed Mr. Strifas instructing female servers to dress in (what he apparently considers) a sexy manner, and some of the girls actually do so. Orellana has often asked them why they would do so, and if Mr. Strifas overhears Orellana, he says to her: "Don't worry about it Donna." Orellana often commented that she would not let her daughter leave the house looking like that, and in response Mr. Strifas typically tells her: "well, that's 'cause you're old";

p.  On January 6, 2016, when four New York State Troopers came to eat at the diner, he pulled them away from being seated in Orellana's section of the diner and told them he was going to "give [them] instead to the best looking server here," referring to a 22-year-old female waitress;

q.  In the summer of 2015, Orellana overheard Mr. Strifas tell Sandra, a cashier, that he would give her $50 to go into the bathroom and take off her panties;

r.  On several occasions Orellana heard Mr. Strifas tell Plaintiff O'Donnell, that she

has "the ass of a 12-year old boy";

    s.  On at least one occasion, Orellana overheard Mr. Strifas tell a group of employees that Plaintiff O'Donnell was "a tease."

50. Mr. Strifas does not only harass Orellana, but has also made such degrading comments to or in front of other female servers such that they have been extremely upset at work or resigned from employment as a result of it, including Plaintiff O'Donnell, Sandra, Jalysssa, and Judith.

51. The harassment and the disgusting sexual things Orellana has witnessed became so bad that she would often cry at work or on her way home. Also, on several occasions, other younger female servers have come to Orellana for advice in how to handle the way that they are feeling harassed, as they look to Orellana as someone with experience in dealing with Mr. Strifas either because of her age or because she has worked at the diner since the year 2000. It greatly offends Orellana to witness first-hand the anguish these other women are going through at the hands of Mr. Strifas.

52. All of the above harassment, including Mr. Strifas making comments about how Orellana is a cow that should be put out to pasture, questioning her ability to continue working (she was only 44 years old), the comments made about other women and the things Orellana has witnessed him doing to other women, the vulgar comments about patrons' and employees' appearances, have made Orellana extremely uncomfortable as a woman to the point where she fears she has to make a choice between being unemployed or else enduring the intolerable atmosphere at the diner. Orellana is psychologically and emotionally harmed, as she has either cried at work on many occasions or has gone home

to sob as a result of Mr. Strifas's behavior. This atmosphere has not only affected Orellana, but has also put a significant strain on her relationship with her husband, her daughter, her son, and men in general.

53. The foregoing conduct constitutes a hostile work environment based upon gender and age in violation of 42 U.S.C. § 2000e-2(a) and 29 U.S.C. § 623(a)(1), making Defendant Stardust Diners, Inc. liable to Plaintiff Orellana for compensatory damages, attorneys' fees, and the costs and disbursements of this action.

## AS AND FOR A SIXTH CAUSE OF ACTION

### NYSHRL - Hostile Work Environment Based on Age and Gender - Plaintiff Orellana

54. The conduct set forth in the Fifth Cause of Action also constitutes a hostile work environment based upon gender and age in violation of NY Executive Law § 296(1)(a), making Defendants liable to Plaintiff Orellana for compensatory damages, attorneys' fees, and the costs and disbursements of this action.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### FLSA and NYLL - Minimum Wage - Both Plaintiffs

55. As an employee of Defendants, O'Donnell was required to work a normal schedule of 53 hours per week as follows:

    a. Monday 9:00 a.m. to 4:00 p.m.

    b. Tuesday 9:00 a.m. to 3:00 p.m.

    c. Wednesday Day Off

    d. Thursday 11:00 a.m. to 9:00 p.m. (one-hour break)

    e. Friday 11:00 a.m. to 9:00 p.m. (one-hour break)

    f.   Saturday 9:00 a.m. to 9:00 p.m. (one-hour break)

    g.   Sunday 8:00 a.m. to 8:00 p.m. (one-hour break)

56. As an employee of Defendants, Orellana was required to work a normal schedule of a minimum of 49 hours per week as follows:

    a.   Monday 8:00 a.m. to 4:30 p.m. (or 4:00 p.m.)

    b.   Tuesday 8:00 a.m. to 4:30 p.m. (or 4:00 p.m.)

    c.   Wednesday 8:00 a.m. to 4:30 p.m. (or 4:00 p.m.)

    d.   Thursday 8:00 a.m. to 4:30 p.m. (or 4:00 p.m.)

    e.   Friday 8:00 a.m. to 4:00 p.m. (every fourth Friday was off)

    f.   Saturday 8:00 a.m. to 5:30 p.m. (or 5:00 p.m.)

    g.   Sunday Day Off

57. Due to the nature of the hospitality industry and the realities of being a server attending to customers, Plaintiffs would often work longer than their scheduled shift times or would pick up additional shifts from other servers who needed to take time off, such that Plaintiffs' schedules would vary in that their hours would increase in many workweeks.

58. Defendants paid Plaintiff an hourly rate of pay in cash of $2.00 per hour until approximately August 2012, at which point the hourly rate was raised to $5.00 per hour.

59. At all relevant times, Plaintiff's hourly wage was less than the required minimum wage under the FLSA and NYLL, and Defendants are not entitled to take a "tip credit" against the minimum wage due to their failure to inform the service employees that they wished to take a tip credit, their failure to accurately report the amount of tips earned by their service employees in each workweek, and their failure to ensure that their employees

received all tips to which they are entitled, as set forth below.

60. Defendants' act of paying Plaintiffs at a rate of less than the then-applicable minimum wage per hour violates the minimum wage requirements of 29 U.S.C. § 206, NY Labor Law § 652 and 12 N.Y. C.R.R. § 146-1.2.

61. Defendants' violation of the FLSA and NYLL in this regard was willful, particularly considering that Defendants were under investigation by the U.S. Department of Labor for similar wage violations prior to September 2010 which resulted in an investigation commencing in or about June 2012 of which Defendants were aware.

62. Defendants are liable to Plaintiffs for unpaid minimum wages, plus liquidated damages in the amount of the wages wrongfully withheld, pre- and post-judgment interest, attorneys' fees, and the costs and disbursements of this action.

<u>**AS AND FOR AN EIGHTH CAUSE OF ACTION**</u>

<u>**FLSA and NYLL - Overtime - Both Plaintiffs**</u>

63. As set forth in above, Plaintiffs often worked in excess of 40 hours per week, yet Defendants failed to pay Plaintiffs the overtime premium of one-half times their regular rate of pay (i.e., what should have been the minimum wage) for all hours worked in excess of 40 hours in a workweek as required by the FLSA and NYLL.

64. In addition to not compensating Plaintiffs at the proper rate of pay, Defendants had a common policy of underreporting their hours in an effort to avoid the requirements of the FLSA and NYLL, in that most of their paychecks only report that Plaintiffs worked 40 hours per week.

65. Defendants' failure to pay premium overtime pay to Plaintiffs for all hours worked over

40 in any given workweek violates 29 U.S.C. § 207 and 12 N.Y. C.R.R. § 146-1.4.

66. Defendants' violation of the FLSA and NYLL in this regard was willful, particularly considering that Defendants were under investigation by the U.S. Department of Labor for similar wage violations prior to September 2010 which resulted in an investigation commencing in or about June 2012 of which Defendants were aware..

67. Defendants are liable to Plaintiffs for all premium overtime pay wrongfully withheld, plus liquidated damages in the amount of the overtime pay wrongfully withheld, pre- and post-judgment interest, attorneys' fees, and the costs and disbursements of this action.

## AS AND FOR A NINTH CAUSE OF ACTION

### NYLL - Spread of Hours Wages - Both Plaintiffs

68. As set forth above, Defendants required Plaintiffs to work in excess of 10 hours per day during certain shifts of their normal schedule and on days where Plaintiffs would pick up extra shifts from other servers.

69. Defendants failed to pay Plaintiffs a "spread of hours" premium on such days where their total spread of hours, as defined by the NYLL and its implementing regulations, exceeded 10 hours, resulting in an underpayment of at least one hour at the applicable minimum wage rate for each day in which their workday exceeded 10 hours.

70. Defendants willfully and intentionally failed to compensate Plaintiffs one hour's pay at the basic New York minimum hourly rate on each day in which their workday exceeded 10 hours, as required by 12 N.Y. C.R.R. § 146-1.6.

71. Defendants' violation of the NY Labor Law in this regard was willful.

72. Defendants are liable to Plaintiffs for unpaid spread of hours pay, 100% of that amount as

liquidated damages, pre- and post-judgment interest, attorneys' fees, and the costs and disbursements of this action.

## AS AND FOR A TENTH CAUSE OF ACTION

### NYLL - Wage Theft Prevention Act - Both Plaintiffs

73. During the course of Plaintiffs' employment, Defendants failed to maintain accurate and sufficient compensation and time records with respect to Plaintiffs. As a result of such failure, Defendants have failed to make, keep, and preserve records sufficient to determine the wages, hours, and other conditions of employment of Plaintiffs in violation of the FLSA, 29 U.S.C. §§ 211(c) & 215(a)(5), and NY Labor Law § 195.

74. Subsequent to February 1, 2012, Defendants did not provide Plaintiffs with a yearly wage statement in compliance with the requirements of NY Labor Law § 195(1) and are, therefore, liable to the Plaintiffs for the penalties set forth in NY Labor Law § 198(1-b), post-judgment interest, attorneys' fees, and the costs and disbursements of this action.

75. Subsequent to April 9, 2011, Defendants did not provide Plaintiffs with a weekly wage statement in compliance with the requirements of NY Labor Law § 195(3) and are, therefore, liable to Plaintiffs for the penalties set forth in NY Labor Law §198(1-d), post-judgment interest, attorneys' fees, and the costs and disbursements of this action.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION

### NYLL - Theft of Gratuities - Both Plaintiffs

76. Defendants' policy was to require all service employees to turn over a portion of their gratuities to management equal to 15% of 15% of their gross restaurant sales for each shift they worked, regardless of how much the service employees actually earned in

26

gratuities off of those sales.

77. Defendants' stated reason for this policy was that the 15% tip-out was meant to provide a portion of the gratuities earned to Colony Diner bussers, purportedly as a legitimate tip-sharing arrangement.

78. However, Plaintiffs know based upon their observations and conversations with Colony Diner bussers that the 15% tip-out was never in fact given to the bussers as tips, as the bussers in the restaurant have reported that they are paid a straight hourly or weekly wage and do not receive any tips from Colony Diner management in accordance with the purported tip pool.

79. Upon information and belief, Defendants simply utilized the 15% taken from each service employee for other purposes, such as to pay the operating expenses or wages of Colony Diner, or to otherwise earn income for the Defendants individually.

80. Defendants' policy of requiring Plaintiffs to pay a portion of their gratuities to management is in violation of NYLL § 196-d which prohibits an employer from keeping or demanding a portion of a service employee's gratuities except in extremely narrow circumstances, such as for the operation of a legitimate tip pool or tip sharing arrangement, which did not exist at Colony Diner due to the circumstances set forth above.

81. Defendants' violation of NYLL § 196-d also results in Defendants' loss of any entitlement to a tip-credit against the federal or state minimum wage.

82. Defendants' act of retaining a portion of Plaintiffs' gratuities violates NYLL § 196-d and 12 N.Y. C.R.R. § 146-2.16(b).

83. Defendants' violation of the NY Labor Law in this regard was willful.

84. Defendants are liable to Plaintiffs for all gratuities wrongfully taken from them, plus liquidated damages in the amount of the gratuities wrongfully taken, pre- and post-judgment interest, attorneys' fees, and the costs and disbursements of this action.

## AS AND FOR A TWELFTH CAUSE OF ACTION

### FLSA and NYLL - Illegal Deduction for Meals

85. Defendants would take a deduction against Plaintiffs' wages for meals that were purportedly given to Plaintiffs which they did not, in fact, receive or take.

86. Defendants deducted a meal credit for each shift Plaintiffs worked regardless of whether Plaintiffs ate a meal.

87. Defendants' policy of deducting for meals which were not taken by Plaintiffs is in violation of 29 U.S.C. §§ 203(m), 206, and 207, NYLL § 193 and 12 N.Y. C.R.R. § 146-1.9, § 146-2.7, and § 146-2.8.

88. Defendants' violation of the NY Labor Law in this regard was willful.

89. Defendants are liable to Plaintiffs for all unused meal deductions taken from them, plus liquidated damages in the amount of the meal deductions wrongfully taken, pre- and post-judgment interest, attorneys' fees, and the costs and disbursements of this action.

### JURY DEMAND

90. Plaintiffs demand a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and pray that the Court:

A. Enter judgment in favor of the Plaintiffs on each or any count of this Complaint for all

compensatory damages and, where applicable, liquidated damages, punitive damages, attorneys' fees, pre- and post-judgment interest, and the costs and disbursements of this action; and,

B. Grant to Plaintiffs any other and further relief that to the Court seems just and proper.

Dated: Uniondale, New York
      June 14, 2017                      Respectfully submitted,


                     _____s/_____
                     Eric S. Tilton
                     Tilton Beldner LLP
                     626 Rxr Plaza
                     Uniondale, New York 11556
                     (631) 629-5291
                     etilton@tiltonbeldner.com